**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 22-20732-CIV-BLOOM/Otazo-Reyes**

SERGIO EMIR BURGOS,

      Plaintiff,

v.

KILOLO KIJAKAZI,
Acting Commissioner of Social Security,[1]

      Defendant.

_____/

## REPORT AND RECOMMENDATION

THIS CAUSE is before the Court upon Plaintiff Sergio Emir Burgos' ("Claimant") Motion for Summary Judgment [D.E. 18] and Memorandum of Law [D.E. 18-1] (hereafter, "Claimant's Motion for Summary Judgment") and Defendant Kilolo Kijakazi, Acting Commissioner of Social Security's ("Commissioner") Motion for Summary Judgment and Response to Plaintiff's Motion for Summary Judgment with Supporting Memorandum of Law (hereafter, "Commissioner's Motion for Summary Judgment") [D.E. 19]. The administrative transcript (hereafter, "TR.") has been filed [D.E. 16].[2] For the reasons stated below, the undersigned respectfully recommends that Claimant's Motion for Summary Judgment be DENIED, the Commissioner's Motion for Summary Judgment be GRANTED, and the Commissioner's decision be AFFIRMED.

---

[1] Kilolo Kijakazi became Acting Commissioner of Social Security on July 9, 2021.  Pursuant to Federal Rule of Civil Procedure 25(d), Kilolo Kijakazi should be substituted for Andrew Saul as the defendant in this suit.  No further action need be taken to continue this suit by reason of the last sentence of Section 405(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2] The references hereafter (TR. __) are to the transcript pages rather than the court record pages.

## **PROCEDURAL HISTORY**

Claimant filed an application for disability insurance benefits ("DIB") on August 27, 2019, alleging a disability onset date of August 19, 2019.  TR. at 20.  The application was denied initially and upon reconsideration.  Id.  Upon Claimant's written request, a telephonic hearing was held on December 1, 2020, before Administrative Law Judge Gracian A. Celaya ("ALJ Celaya"), at which Claimant and Vocational Expert Don Stephens ("VE Stephens") testified.  Id.

On February 19, 2021, ALJ Celaya issued an Unfavorable Decision, finding the following:

(1) Claimant met the insured status requirements of the Social Security Act through March 31, 2022.  Id. at 22.

(2) Claimant had engaged in substantial gainful activity during the periods of October 2019 to December 2019 (20 C.F.R. §§ 404.1520(b) and 404.1571 et seq.).  Id.  However, Claimant did not engage in substantial gainful activity for a continuous 12-month period from December 2019 to December 2020.  Id.

(3) Claimant had the following severe impairments: disorders of the spine, neuropathy, carpal tunnel syndrome, diabetes, obesity, and sleep disorder (20 C.F.R. § 404.1520(c)).  Id.

(4) Claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526).  Id. at 23.[3]

(5) Claimant had the residual functional capacity (hereafter, "RFC") to perform sedentary work as defined in 20 CFR § 404.1567(a), subject to additional limitations.  Id.[4]

---

[3] The Social Security Administration's ("SSA") Listing of Impairments "describes for each of the major body systems impairments that [the SSA] consider[s] to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience."  20 C.F.R. §§ 404.1525(a) and 416.925(a).

[4] The RFC is the ability of a claimant to do physical work activities on a sustained basis, despite the claimant's limitations or impairments.  20 C.F.R. § 416.945(a)(1).  The RFC must be determined based on all the claimant's impairments, even those that are not considered "severe."  See 20 C.F.R. §§ 416.920 and 416.945.

 "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. §§ 404.1567(a) and 416.967(a).

(6) Claimant was capable of performing past relevant work as an accounting specialist. (20 C.F.R. §§ 404.1565). Id. at 30.[5]

(7) Claimant had not been under a disability, as defined in the Social Security Act, from August 19, 2019, through the date of the Unfavorable Decision (20 C.F.R. §§ 404.1520(f)). Id. at 31.

On September 21, 2021, the Appeals Council denied a request for review of ALJ Celaya's Unfavorable Decision. Id. at 6. On July 2, 2022, pursuant to 42 U.S.C. §§ 405(g), Claimant filed this action, seeking reversal of ALJ Celaya's final administrative decision [D.E. 1].

In support of his contention that ALJ Celaya's Unfavorable Decision should be reversed, Claimant argues that:

I.      The ALJ failed to assess the persuasiveness of the medical opinions.

II.     The ALJ failed to properly consider the Claimant's testimony regarding the intensity, persistence, and limiting effects of his symptoms.

See Claimant's Motion for Summary Judgment [D.E. 18-1]. The undersigned finds no merit in either of these contentions.

## RELEVANT MEDICAL EVIDENCE

### A.  Treating Sources

#### 1)  Nathan Lebwohl, M.D. ("Dr. Lebwohl")

On February 28, 2014, Claimant visited Dr. Lebwohl, an orthopedic spine specialist, for a consultation due to lower back pain. TR. at 324–35. Dr. Lebowhl noted that Claimant's lower back pain began in September 2011 and that Claimant's symptoms would likely be lifelong after Claimant underwent a failed lumbar fusion in 2013. Id. at 325. Dr. Lebwohl further opined that Claimant was "ok for sedentary work" with intermittent episodes of bedrest, and that Claimant

---

[5] "Past relevant work is work that you have done within the past 15 years, that was substantial gainful activity, and that lasted long enough for you to learn to do it." 20 C.F.R. §§ 404.1560(b)(1) and 416.960(b)(1).

would not be incapacitated for a continuous period.  Id.  at 325–26.  Dr. Lebwohl further opined

that Claimant would likely have flare-ups approximately 4 times a month over the next 6 months,

and in those instances, Claimant should take 2-3 days off as needed.  Id. at 326.

Dr. Lebwohl rendered an additional opinion in 2018 following Claimant's consultation for

additional care for low back pain.  Id. at 329, 331.  Dr. Lebwohl assessed Claimant's status as

essentially unchanged and indicated that Claimant would have "intermittent" flare-ups of low back

pain that would require bedrest, but otherwise, Claimant was "OK for sedentary work."  Id. at 329.

### 2)  Marilia Nery, M.D. ("Dr. Nery")

On February 24, 2016, Claimant visited his primary care provider, Dr. Nery, for a CT scan

of the lumbar spine.  TR. 298.  The CT scan revealed post posterior instrument fusion at the L5-

S1, with screws affixed to rods.  Id. at 299. Dr. Nery determined that the hardware appeared well

seated and intact without evidence of loosening.  Id.  Dr. Nery also observed multilevel

degenerative changes of Claimant's lumbar spine, a moderate sac compression and mild bilateral

neural foraminal narrowing, and a large foramina osteophyte that appeared to severely narrow the

right neural foramen and abut the descending S1 nerve root.  Id.  Dr. Nery ordered a magnetic

resonance imaging ("MRI") of Claimant's lumbar spine.  Id.

On October 24, 2016, an MRI of Claimant's lumbar spine showed stable postsurgical

changes consistent with posterior instrumented fusion of the L5 and S1 joints with intervertebral

cage on Claimant's right side.  Id.  at 298.  Dr. Nery determined that the intervertebral cage caused

mild impingement on the right thecal sac with suggestion of abutment on the descending right S1

nerve root.  Id.  Dr. Nery also observed complex sclerosis and fusion at L5-S1, which Dr. Nery

opined was causing moderate narrowing of Claimant's right L5-S1 neural foramen.  Id.  However,

there were no significant changes from the CT of Claimant's lumbar spine from February 24, 2016. Id. at 298–99.

On February 11, 2020, Dr. Nery saw Claimant for a follow-up consultation due to his complaints of continuous low back pain that radiated into his right leg and reported muscle weakness on his right side. Id. at 359–60. Claimant advised Dr. Nery that he had fallen twice at work. Id. at 360. Claimant reported using a walking-cane since 2019 and that his pain was somewhat relieved with non-steroidal anti-inflammatory drugs. Id. Dr. Nery observed a visible surgical scar from Claimant's back surgery in 2012, but that Claimant otherwise had a normal appearance of back, hips, and legs, with a normal range of motion of the spine. Id.

Following Claimant's February 11, 2020, visit, Dr. Nery completed a physician's questionnaire in which she opined that Claimant could not climb stairs or ladders or walk long distances. Id. at 369, 373. She also opined that Claimant could not use a cane or other ambulatory device and that he could not stand for prolonged periods of time. Id. As support for these conclusions, Dr. Nery cited the MRI and X-Ray of Claimant's lumbar spine, an electromyography (EMG), and her physical exam of Claimant. Id. She reported Claimant's symptoms as pain radiating from his back down to his right leg and foot, in addition to weakness in his right leg and recurrent falls. Id. She noted his level of pain as moderately severe, and that Claimant was "always" in pain. Id. Dr. Nery noted that, until March 12, 2020, Claimant had not been treated with medication. Id. at 374. She also noted that Claimant could: walk half a block to one block at a time before stopping; sit for 20 minutes at a time before needing to get up, move around, or switch positions; and stand for five minutes at a time before needing to sit down or walk around. Id. Dr. Nery further opined that, within an 8-hour workday, Claimant could stand less than 2 hours and could sit for about 4 hours. Id. at 375. In response to a question asking if Claimant were to

work full-time, how many days per month would he be absent from work due to impairments or treatment, Dr. Nery opined that Claimant would be absent more than 4 days per month. Id. Dr. Nery concluded that, based on Claimant's restrictions, she did not believe he could perform full-time sedentary work on a full-time basis. Id. at 376.

### 3)  Dadeland MRI & CT

On July 17, 2019, Claimant underwent an MRI of his lumbar spine at Dadeland MRI & CT to determine the progress of his post spinal fusion. TR. at 334. Claimant's MRI identified no acute post-surgical complications. Id. At L5-S1, there was a disc protrusion herniation with moderate right neural foraminal stenosis and mass effect on the exiting right L5 nerve root. Id. at 334–35. The MRI also revealed a shallow right disc protrusion/herniation with resulting mild spinal stenosis and a subtle circumscribed 1 cm T2/STIR hyperintense lesion in the T12 vertebral body. Id. at 335. This was statistically likely to reflect an atypical hemangioma in the absence of known malignancy. Id.

### 4)  Salem Jafilan, M.D. ("Dr. Jafilan")

On August 23, 2019, Claimant saw Dr. Jafilan at the University of Miami's Sylvester Comprehensive Cancer Center due to back pain radiating down his right leg, right leg weakness, and numbness in his feet. TR. at 309. Claimant's medical history included lumbar spine surgery after a motor vehicle accident in 2011, Type 2 diabetes mellitus, and hypertension. Id. Claimant reported using a cane for walking due to chronic pain, which he said would cause his right leg to occasionally give out. Id. On examination, Claimant had decreased sensation to pinprick in most of his right lower extremity and his joint position sense was absent in his right toes and intact on the left. Id. Manual and functional testing were severely limited in Claimant's lower right leg due to pain; however, Claimant had at least 4/5 strength in his right lower extremity and full strength

in his left lower extremity.  Id.  No atrophy was noted.  Id.  Dr. Jafilan opined that Claimant's right radial sensory nerves and reflexes were normal.  Id.

### 5)  Douglas McKay Wallace, M.D. ("Dr. Wallace")

On September 5, 2019, Dr. Wallace examined Claimant for a sleep evaluation after Claimant reported difficulties sleeping.  TR. at 306.  Claimant reported that he had back issues associated with a tumor, which he believed was causing him fatigue and pain.  Id.  Claimant did not report any symptoms of restless leg syndrome.  Id.  Claimant presented as obese and not in acute stress, with normal heart rate.  Id. at 307.  Dr. Wallace diagnosed Claimant with mild to moderate sleep apnea, with daytime sleepiness, comorbid hypertension, and diabetes.  Id.  Dr. Wallace recommended PAP therapy to address Claimant's sleep apnea and advised Claimant to reduce his weight and refrain from taking alcohol at night; Claimant agreed to this plan.  Id. at 308.

Based on the Claimant's list of prescribed medications, as of March 27, 2020, Claimant was not on PAP therapy or any medication for sleep apnea.  Id. at 344–45; 381–82.

### 6)  Peter Millheiser, M.D. ("Dr. Millheiser")

On January 28, 2020, Claimant was referred by his health insurer, Sun Life Assurance Company ("Sun Life"), to Dr. Millheiser for an independent orthopedic examination in connection with a private, long-term disability claim that Claimant had submitted to Sun Life.  TR. at 287–89.  Claimant presented as weighing 230 pounds at 5 feet 9 inches in height; he was not in any acute distress.  Id. at 28.  Claimant presented with mild lumbar spasms with flattening of the lumbar lordosis, and he had well-healed lumbar scars from prior surgery; Claimant did not have any trigger points.  Id.  Claimant was able to get on and off the exam table normally.  Id.  Dr. Millheiser noted a flattening of Claimant' lordosis but did not see any atrophy of Claimant's lower extremities.  Id.  A motor examination of his lower extremities showed no appreciable weakness.  Id.  Claimant's

knee and ankle reflexes were intact; straight leg raising was negative sitting, positive on the right at 10 degrees, and on the left at 20 degrees.  Id.  Multiple Waddell tests were positive for exaggeration, including transverse pelvic compression, transverse pelvic rotation, double thigh flexion, and disparate straight leg raising.  Id.

Dr. Millheiser opined that Claimant was limited to sedentary work and concluded that "there were no objective findings that would preclude the [C]laimant from doing his regular work." Id. at 289.  Dr. Millheiser further concluded that "there is considerable evidence of over exaggeration".  Id. at 289.  Dr. Millheiser noted that Claimant's doctor, Dr. Gjolaj, previously indicated that Claimant had the capacity to do sedentary exertion with: frequent sitting; occasional standing, walking, pushing, pulling, balancing; carrying up to 10 pounds; and negligibly bending, squatting, twisting, and kneeling.  Id.  However, Dr. Millheiser indicated he did not think Claimant's condition would improve because there was "a considerable amount of overlay in the complainant's complaints."  Id. at 290.  Nevertheless, he indicated that there was "absolutely nothing which would support the claimant's being 90% disabled from basic life support activities . . . or 80% disabled from personal maintenance and independence".  Id.  Dr. Millheiser also opined that. "There is nothing that would go with his being 100% disabled from social activity or from recreation or family and home responsibilities."  Id.  Dr. Millheiser noted that, despite Claimant reporting he was disabled from enjoying recreational and family activities, he was able to vacation in Belize.  Id.  Dr. Millheiser concluded that, in the future, Claimant "should be able to increase his functioning" and "he should be able to go up to lifting 20 pounds" occasionally.  Id.

Based on these conclusions from Dr. Millheiser, Sun Life denied Claimant's long-term disability claim.  Id.

### 7)   Laura Lee Huang, MD ("Dr. Huang")

On March 4, 2020, Claimant visited Dr. Huang complaining of low back pain radiating down his right leg.  TR. at 354.  Claimant complained of persistent numbness down his right leg that he claimed caused him to repeatedly fall at work.  Id.  Dr. Huang noted that Claimant's pain began in 2009 when he was rear-ended by a truck.  Id.  Since then, he had multiple epidurals for low back pain and underwent a L5-S1 fusion with cage in 2011; his last epidural injection was in 2016.  Id.  Claimant continued with treatment, including with pain killers, but experienced little improvement.  Id.  At the time of his visit, Claimant presented with no peripheral edema or cyanosis, and upon inspection of his lower extremities, there was no malalignment or structural abnormality appreciated.  Id. at 356.  However, Claimant presented with pronounced muscle bulk throughout the upper and lower extremities.  Id.  He had a body mass index over 30 and was considered obese.  Id. at 356, 364. His coordination was normal, and his gait was antalgic.  Id. at 356.  When asked to tandem gait, Claimant fell onto the exam table, and his sensation was diminished to light touch in the right lower extremity over the anterior thigh, medial calf, dorsum of foot, and plantar surface of foot.  Id. at 356–57.  Claimant also presented with normal lordosis without signs of instability, and his bilateral hip range of motion was symmetric and pain-free.  Id. at 357.  Claimant had no malalignment or structural abnormality of the bilateral lower extremities; and his range of motion was within normal functional limits.  Id.  Based on these observations, Dr. Huang diagnosed Claimant with chronic right lower extremity pain secondary to failed back syndrome, right L5-S1 neuroforaminal narrowing, and right leg weakness with frequent falls.  Id. at 357–58. Dr. Huang referred Claimant to neurology for further work-up.  Id. at 358, 366, 395.

On May 12, 2020, Dr. Huang issued a memorandum for the Social Security Administration after receiving their request for medical evidence to assist them in making a Social Security

disability determination.  Id. at 414.  Dr. Huang opined that, based on Claimant's one visit on March 4, 2020, it was not safe for Claimant to stand or walk for work with a cane given his history of falling.  Id. at 415.  Dr. Huang recommended a surgical follow-up and that Claimant receive pain management and treatment.  Id.

On May 21, 2020, Dr. Huang issued another opinion in response to a questionnaire from the Social Security Administration.  Id. at 421.  Dr. Huang marked "sensory loss", "gait disturbance", and "motor loss" as physical symptoms resulting from a neurological impairment and recommended that Claimant be prescribed a walker to assist with walking.  Id. at 423.

### 8)  Joseph Gjolaj, M.D. ("Dr. Gjolaj")

On March 16, 2020, Dr. Gjolaj completed a physician's questionnaire in which he noted Claimant's level of pain increased from always moderately severe to always severe.  Id. at 377. This assessment differed from the March 12, 2020, physician questionnaire completed by Dr. Nery in which she noted Claimant's pain as moderately severe.  Id. at 374.  Dr. Gjolaj noted Claimant self-reported as unable to stand, walk, or sit for long periods of time with balance issues and frequent falls.  Id.  Dr. Gjolaj reported that Claimant's complaints of pain correlated with his personal observations and physical examination findings of Claimant.  Id. at 378.  Dr. Gjolaj also noted that Claimant reported that he had recently started taking prescription and over-the-counter medicine to alleviate his pain, but that he still had trouble performing his job duties as an accounting specialist due to pain.  Id.  Dr. Gjolaj opined that Claimant could: walk for half a block at a time before needing a break; sit for 20 minutes at a time; and stand for 10 minutes at a time before needing a break.  Id.  He further opined that Claimant could sit for less than 2 hours and stand for less than 2 hours in an 8-hour working day.  Id. at 379.  Dr. Gjolaj further opined that Claimant would likely be "off task" 20% of the time in a typical workday due to issues with

concentration caused by pain, and that Claimant would likely miss more than 4 days per month if he worked full-time.  Id.  Dr. Gjolaj concluded that Claimant would be unable to perform full-time sedentary work on a full-time basis because Claimant was unable to sit or walk for prolonged periods and was unable to lift more than 10 pounds.  Id. at 380.

### 9)  Herminsul Jara, Doctor of Physical Therapy ("Dr. Jara")

On May 5, 2020, Dr. Jara completed a functional capacity assessment of Claimant.  TR. at 404.  Dr. Jara opined that Claimant could handle lifting and carrying 10 pound and pushing and pulling 15 pounds.  Id. at 406.  However, Dr. Jara also determined that Claimant did not demonstrate the ability to perform within the sedentary physical demand level based upon the definitions developed by the U.S. Department of Labor and outlined in the Dictionary of Occupational Titles.  Id.  Dr. Jara opined that Claimant was capable of occasional fine motor coordination and occasional lifting bilaterally.  Id.  Dr. Jara further opined that Claimant "did put forth full and consistent effort during th[e] evaluation."  Id. at 406.

### 10) Khema Ram Sharma, M.D. ("Dr. Sharma")

On May 27, 2020, Claimant saw Dr. Sharma via Zoom telehealth for a neurological examination.  TR. at 426.  Claimant complained of lower back pain, pain and tingling in his right leg and hand, and poor balance.  Id.  Claimant had initially reported some improvement of these symptoms after surgical intervention and conservative therapy but experienced a downturn in his rehabilitation after being struck by a bullet in his left ankle that required surgical intervention.  Id. Since then, Claimant complained that his had symptoms worsened.  Id. at 426–27.  Dr. Sharma's exam of Claimant revealed that he was in no apparent distress and did not have a malalignment or structural abnormality.  Id. at 427–28.  Claimant was able to stand from a sitting position without using his hands and was able to stand on either leg but could not hop on his right leg because of

balance concerns.  Id. at 428.  Claimant was able to tandem gait with some difficulty and had difficulty going on his toes and heels with his right leg.  Id.  His gait was normal, and his muscle bulk appeared to be even on both sides, and he had no signs of muscle atrophy.  Id.  Dr. Sharma recommended that Claimant continue with physical therapy and gait training, and advised that if physical therapy fatigued Claimant, he could do home exercises in pieces rather than performing exercises for a full hour.  Id.  Dr. Sharma also determined that Claimant's peripheral neuropathy was most likely secondary to Claimant's diabetes but requested that Claimant be tested for vitamin disorders and mixed connective tissue disorders with a follow-up consultation.  Id. at 429, 440. With respect to Claimant's right carpal tunnel syndrome, Dr. Sharma recommended that Claimant wear a splint at nighttime and use a wrist support when working at the computer.  Id.

On June 22, 2020, Claimant was seen by Dr. Sharma for a follow-up consultation.  Id. at 497. Claimant reported feeling better with a pain level of 2/10 but he had an abnormal glucose tolerance test.  Id. at 497–98.  Dr. Sharma prescribed weekly B-12 injections for four weeks, and then monthly for six weeks; Claimant was to continue his medication for hypertension and diabetes mellitus.  Dr. Sharma diagnosed Claimant as obese with a BMI of over 30.  Id. at 498.

**11) Stephanie Beckel, Doctor of Physical Therapy ("Dr. Beckel")**

Claimant underwent physical therapy on May 27, 2020 by Dr. Beckel.  Tr. at 455.  Claimant reported a pain level of 5 out of 10; Dr. Beckel noted Claimant had poor muscle endurance, fatigued easily, and generally had poor posture.  Id. at 456.  Dr. Beckel further noted that Claimant had limited tolerance and gradual progression in his exercise program, with no appreciable changes to his condition.  Id.  Dr. Beckel prescribed more gait training, manual therapy for joint mobility and neuromuscular re-education for improved balance and posture.  Id.  Claimant also underwent

physical therapy on May 28, 2020, with soft tissue work, manual therapy, and education regarding proper gait mechanics with a walking cane.  Id. at 458.

Claimant was treated again by Dr. Beckel on June 18, 2020.  TR. at 450.  Dr. Beckel noted that Claimant reported feeling better than usual and she advised him to continue physical therapy in the clinic twice a week.  Id.  However, Claimant preferred to do physical therapy at home due to Covid-19 and therefore, continued his physical therapy treatments via telehealth.  Id.  Dr. Beckel noted Claimant's pain level was 2/10 and that he had a normal glucose tolerance test.  Id.  Claimant had issues remembering his physical therapy exercises and Dr. Beckel noted that Claimant did not appear to be following the recommended program consistently and discussed with him the importance of consistency for meaningful progress.  Id.

On June 23, 2020, Claimant reported that he had been practicing his home exercise program more diligently and showed improvement in his activity tolerance, endurance, and exercise form.  Id. at 497.  He was to continue with his home exercise program.  Id.

On June 30, 2020, Claimant's physical therapy notes indicate he had a decreased range of motion of his trunk and back, and decreased strength of his trunk and lower extremities.  Id. at 504.  Claimant continued to report pain in his right leg and lower back.  Id.  However, according to a physical therapy note dated August 25, 2020, Claimant showed improvement in both his mobility and activity tolerance.  Id. at 535.

On October 28, 2020, Dr. Beckel noted that Claimant had gradually improved in motor patterns and activity tolerance and had likely met maximal medical improvement within the parameters of telehealth.  Id. at 519.  Claimant was advised he could continue treatment in the clinic, but he preferred to remain at home due to the Covid-19 pandemic.  Id.

### 12) Sharhabi Ammus, M.D. ("Dr. Ammus")

On October 13, 2020, Claimant was seen by Dr. Ammus for a blood work analysis after having an abnormal glucose tolerance test.  TR. at 523.  Claimant presented with abnormal serum, protein electrophoresis, and the presence of polyclonal gammopathy.  Id.  However, Dr. Ammus found that Claimant's lab results were nonspecific and reactive in nature and that there was nothing to suggest monoclonal gammopathy or plasma cell dyscracia.  Id. at 524.  Therefore, Dr. Ammus suggested routine monitoring.  Id. at 524.

### B.  Non-treating Sources

#### 1)  State Agency Medical Consultant David Guttman, M.D. ("Dr. Guttman")

On October 18, 2019, Dr. Guttman completed a Physical RFC Assessment for Claimant. TR. at 71, 74.  Dr. Guttman concluded that Claimant had a severe degenerative disc disease and severe sleep-related breathing disorders.  Id. at 71.  Dr. Guttman noted that Claimant used a cane for walking most of the time because his right leg often gave out and his motor abilities were severely limited by pain.  Id. at 74.  He opined that Claimant could sit for about 6 hours in an 8-hour workday and could frequently carry or lift 10 pounds.  Id. at 72.  He further opined that Claimant: could perform light work with limited pulling in the right lower extremity and could occasionally climb ladders, ropes, and scaffolds; but that he should avoid exposure to hazards such as heights and heavy machinery.  Id. at 73.

#### 2)  State Agency Medical Consultant Sharmishtha Desai, M.D. ("Dr. Desai")

On July 1, 2020, Dr. Desai completed a Physical RFC Assessment for Claimant on reconsideration and concluded that Claimant had severe degenerative disc disease and sleep-related breathing disorders.  TR. at 85–86, 92.  Dr. Desai found that Claimant could tandem gait

with some difficulty, his muscle bulk was equal on both sides, he showed no signs of muscle atrophy and his joint movements were normal.  Id. at 85.  Dr. Desai opined that Claimant could perform light work, with limited pushing or pulling in his right lower extremity and he should avoid climbing ladders, exposure to extreme cold or heat, and avoid heavy machinery and heights. Id. at 87–89.  Dr. Desai further opined that Claimant could sit 6 hours in an 8-hour workday.  Id. at 87.  After reviewing Claimant's medical records and physical therapy progress notes, Dr. Desai determine that Claimant had been improving with physical therapy.  Id. at 92.

**HEARING TESTIMONY**

A hearing was held on December 1, 2020 before ALJ Celaya, at which Claimant and VE Jasper testified.  TR. at 37–39.

**I.      Claimant**

Claimant testified that he was 43 years old and measured 5 feet and 10 inches and weighed 248 pounds.  Id. at 44.  Claimant testified that he had completed high school with some college courses and had worked at Norwegian Cruise Lines (NCL) for four years as an accounts payable specialist.  Id. at 46.  He testified that in the past 15 years, he had done accounting work.  Id. Claimant further testified that he was unable to work because of constant lower back and leg pain and stated that he experienced flare-ups one or twice per week.  Id. at 46–47.  At the time of the hearing, Claimant testified he was unemployed and relied on his wife's income as a supervisor for collections at Nicklaus Children's Hospital.  Id. at 45.  Claimant testified he had stopped taking pain killers after reading about potential side effects to his liver; he reported taking Amitriptyline for pain for nearly one year, which he said helped a little but that the medicine was more for nerve damage than a pain medication.  Id. at 47–48.  Claimant also testified that he takes Metformin for diabetes and shots of Vitamin B12, which he gets once per month.  Id. at 48.  Claimant also stated

that he needs a cane for walking and was prescribed a walker in February 2020.  Id. at 52.  He testified that he could walk half a block and can stand for about 20-30 minutes; he testified that he went to the Florida Keys in 2020 and that he was able to tolerate the 30–45-minute drive from his home in Homestead.  Id. at 54, 59.  Claimant testified that his daily activities include walking in his backyard, sitting with his wife, and laying down to nap for 3 to 4 hours.  Id. at 53–54.  Claimant stated that, after his motor vehicle accident in 2011 and subsequent shooting range accident, he started experiencing flare ups while at work and felt himself mentally break down.  Id. at 61.  Claimant further testified that he would sometimes miss three or four consecutive days from work due to pain and that his FMLA allowed him to miss up to 4 days a week, with up to 16 days of missed work per month.  Id. at 61–62.

## II.   VE Jasper

VE Jasper classified Claimant's prior work as: Accounting Specialist, DOT #216.482-010, with an exertional level of sedentary and an SVP of 5.[6]  Id. at 65.

ALJ Celaya posed to VE Jasper two hypotheticals for an individual of Claimant's age, with his education and work experience who:

1) Was capable of performing the full range of sedentary work, with the following additional limitations: the individual walks with a  cane, and occasionally kneel, crouch, crawl, stoop, and balance; should never climb ladders, ropes, or scaffolds; should never climb ramps or stairs; can frequently handle, finger, and feel, and never work at unprotected heights or with dangerous machinery; should never be exposed to

---

[6] Sedentary work is defined as "[e]xerting up to 10 pounds of force occasionally (Occasionally: activity or condition exists up to 1/3 of the time) and/or a negligible amount of force frequently (Frequently: activity or condition exists from 1/3 to 2/3 of the time) to lift, carry, push, pull, or otherwise move objects."  See http://www.occupationalinfo.org/appendxc_1.html.
SVP is defined in the DOT as "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation."   See Dictionary of Occupational Titles app. c (4th ed., rev. 1991), http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOTAPPC.HTM.
An SVP of 5 means that preparation for the job should take "over 6 months up to and including 1 year."  Id.

extreme heat or cold; can never be exposed to vibration; and can never be exposed to noxious fumes, odors, or other pulmonary irritants.  (Hypothetical No. 1).

2) Had the same limitations as the individual in Hypothetical No. 1, except this individual will miss 2 or more days of work a month due to exacerbations of back pain. (Hypothetical No. 2).

Id. at 65–66.

VE Jasper testified that the individual in Hypothetical No. 1 would be able to perform Claimant's past work, but the individual in Hypothetical No. 2 would not be able to perform Claimant's past work because missing two or more days a month "would eliminate all competitive work basically."  Id. at 66.

Claimant's attorney did not have any questions for VE Jasper.  Id.

## STANDARD OF REVIEW

A federal court's "review of a social security case is demarcated by a deferential reconsideration of the findings of fact and exacting examination of the conclusions of law." Williams v. Astrue, 416 F. App'x 861, 862 (11th Cir. 2011).  Thus,

> [t]he Commissioner's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla—i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.

Kieser v. Barnhart, 222 F. Supp. 2d 1298, 1305 (M.D. Fla. 2002) (citations omitted).  However, the Commissioner's "conclusions of law, including applicable review standards, are not presumed valid."  Williams, 416 F. App'x at 862.

## REGULATORY FRAMEWORK:  THE FIVE-STEP SEQUENTIAL PROCESS

The Social Security Regulations outline a five-step "sequential" evaluation process used to

determine whether a claimant is disabled.

First, the ALJ must determine whether a claimant is engaged in "substantial gainful activity" (hereafter, "SGA").  If the ALJ finds that the claimant is engaging in SGA, then the ALJ must find that the claimant is not disabled.  Phillips v. Barnhart, 357 F.3d 1232, 1237 (11th Cir. 2004).  In this case, ALJ Celaya determined that Claimant although Claimant had engaged in SGA from October 2019 to December 2019 after claiming a disability onset date of August 19, 2019, Claimant had not engaged in SGA for a continuous 12-month period since December 2019.  TR. 22.

At the second step, the ALJ must determine if a claimant's impairments are "medically severe."  If the ALJ determines that the claimant's impairments are medically severe, then he or she must proceed to the third step.  Phillips, 357 F.3d at 1237.  In this case, ALJ Celaya found that Claimant suffered from the following severe impairments: disorders of the spine, neuropathy, carpal tunnel syndrome, diabetes, obesity, and sleep disorder.  TR. at 22.  ALJ Celaya then proceeded to step three.  Id.

At step three, the ALJ must determine if a claimant's impairment(s) "meet or equal" any of the listed impairments in the regulations.  Phillips, 357 F.3d at 1238.  If so, the ALJ must find the claimant disabled; if not, then the ALJ should proceed to step four.  Id.  Here, ALJ Celaya determined that Claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.  TR. at 23.  Therefore, ALJ Celaya proceeded to step four.  Id.

Step four is a two-pronged process, which first requires the determination of a claimant's RFC and then, based on that RFC, a determination of whether the claimant can return to any "past

relevant work." <u>Phillips</u>, 357 F.3d at 1238.  As to the first prong, ALJ Celaya determined that

Claimant had the RFC to:

> perform sedentary work as defined in 20 CFR 404.1567(a) except he should never climb ladders, ropes, scaffolds, ramps or stairs.  He can occasionally balance, stoop, kneel, crouch and crawl.  The claimant ambulates with a cane.  He had [sic] frequently handle, finger, and feel.  He should not work at unprotected heights or with dangerous machinery.  He should not be exposed to vibrations, pulmonary irritants or extreme heat or cold.

TR. at 23.

Based on Claimant's RFC, ALJ Celaya moved to prong two of step four and concluded

that Claimant could perform his past relevant work as an accounting specialist and that this work

did not require the performance of work-related activities precluded by Claimant's RFC.  <u>Id.</u> at 30.

Therefore, ALJ Celaya did not need to proceed to the fifth step of the sequential evaluation process

and concluded that Claimant was not under a disability, as defined in the Social Security Act, from

August 19, 2019, through the date of the Unfavorable Decision.  <u>Id.</u> at 31.

## **<u>DISCUSSION</u>**

As noted above, Claimant argues that:

I.      The ALJ failed to assess the persuasiveness of the medical opinions.

II.     The ALJ failed to properly consider the Claimant's testimony regarding the intensity, persistence, and limiting effects of his symptoms.

<u>See</u> Claimant's Motion for Summary Judgment [D.E. 18-1].  The undersigned finds no merit in

either of these contentions.

**I.      Whether the ALJ failed to assess the persuasiveness of the medical opinions in his RFC finding.**

Claimant argues that ALJ Celaya failed to assess the persuasiveness of the medical

opinions by Dr. Nery, Dr. Gjolaj, and Dr. Huang in reaching his RFC finding that Claimant was

capable of performing his past relevant work.  <u>Id.</u> at 5–13.  Claimant specifically argues that ALJ

Celaya's handling of Dr. Nery, Dr. Gjolaj, and Dr. Huang's opinions fails to satisfy 20 C.F.R. § 4040.1520c(b), which provides that the Commissioner "will articulate in [his or her] determination or decision how persuasive [he or she] finds all of the medical opinions and all of the prior administrative medical findings in [the claimant's] case record."

For claims filed on or after March 27, 2017, an ALJ satisfies the articulation standard set forth in 20 C.F.R. § 404.1520c(b) by considering certain factors enumerated in 20 C.F.R. § 404.1520c(c)(1)–(5). "The most important factors [the Commissioner] consider[s] when [] evaluat[ing] the persuasiveness of medical opinions and prior administrative medical findings are supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section)." 20 C.F.R. § 404.1520c(a). With regards to the factor of supportability, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." Id. § 404.1520c(c)(1). With regards to the factor of consistency, "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." Id. § 404.1520c(c)(2). Further, the same regulation provides that the Commissioner will "not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources." Id. § 404.1520c(a).

With respect to Dr. Nery, ALJ Celaya noted that Dr. Nery's "conclusion that the claimant is unable to perform even sedentary work is markedly at odds with the bulk of the opinion evidence from other medical sources", and, therefore, determined that her opinion "is not persuasive"

because "[t]he severity of limitations is not supported by the objective evidence in the record." TR. at 30.  As support for this conclusion, ALJ Celaya compared Dr. Nery's opinion to those of Drs. Jafilan, Wallace, Sharma, and Millheiser, who, unlike Dr. Nery, opined that Claimant could perform sedentary work with some limitations.  See id. at 24-30.  ALJ Celaya also noted that Dr. Nery saw Claimant only once after his alleged onset date of August 19, 2019, in February 2020, and that during that visit, Dr. Nery did not observe any significant changes from the CT of Claimant's lumbar spine from February 24, 2016.  Id. at 298–99.  As a result, the relevancy of Dr. Nery's opinion was undermined by her limited assessment of Claimant after his alleged onset date. See 20 C.F.R. § 404.1520c(c)(1) ("The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be.").  Dr. Nery also appeared to base her opinion largely on Claimant's self-reports that he needed a cane to walk and she vaguely opined that Claimant had "sitting limitations".  Id. at 27, 398.  However, a claimant's subjective statements are not an acceptable basis for a medical opinion.  See 20 C.F.R. §404.1520c(c); Crawford v. Comm'r of Soc. Sec., 363 F.3d 115, 1159-60 (11th Cir. 2004) (noting a claimant's subjective statements could not be the basis for an opinion under the regulations for evaluating medical opinions for claims filed before March 27, 2017).  Furthermore, statements by a medical source reflecting judgments about the nature and severity of a claimant's impairments, the claimant's medical history, clinical findings, diagnosis, treatment prescribed with response, or prognosis are not considered medical opinions because they do not necessarily provide perspectives about the claimant's functional abilities and limitations.  See 20 C.F.R. § 404.1513(a)(2), (a)(3).

With respect to Dr. Huang, ALJ Celaya discussed at length her objective medical findings and found her opinion that Claimant could not perform sedentary work not persuasive and not supported by the overall record.  As noted by the ALJ, Dr. Huang's one-time examination of Claimant in March 2020 revealed Claimant did not have any malalignment or structural abnormalities, and that his range of motion in his lower joint extremities were within functional limits.  TR. at 27, 356.  Dr. Huang also found that Claimant's back revealed normal lordosis without signs of instability; his surgical incisions were well-healed; and he had limited extension and functional flexion without significant pain.  Id. at 27, 357.  The ALJ also noted that Dr. Huang noted an MRI of Claimant's lumbar spine showed "1 level neuroforaminal narrowing" but that this "could not explain entire leg weakness and giving out."  Id. at 30, 357-58.  The ALJ further noted that Dr. Huang did not quantify a history of falls to support her opinion that Plaintiff had "repeated falls" and her assessment appeared to be based on Claimant's self-reports, which, as noted above, is not an acceptable basis for an opinion.  See id. at 30; Crawford, 363 F.3d at 115. Moreover, Dr. Huang failed to explain why Claimant's use of a cane was unsafe for work but was not otherwise unsafe.  TR. at 30.  Thus, Dr. Huang failed to provide acceptable explanations for her medical opinion.  Thus, ALJ Celaya's finding that Dr. Huang's opinion was not persuasive was supported by substantial evidence and satisfies the requirements set forth in 20 C.F.R. § 4040.1520c(b).

With respect to Dr. Gjolaj, this treating source opined that, in an 8-hour workday, Claimant could sit less than two hours total, and that Claimant was unable to sit, stand or walk for approximately 18 hours in a 24-hour period.  TR. at 30, 379.  However, the record indicates that Dr. Gjolaj did not examine Claimant at all during the relevant period after his alleged onset date or even in the year prior to that.  Id. at 26-27, 298-99, 359-61, 396-400.  Therefore, the ALJ's

finding that Dr. Gjolaj's opinion is not persuasive is also supported by substantial evidence.

Additionally, the opinions of Drs. Nery, Huang, and Gjolaj are inconsistent with the opinions from other medical sources, including Drs. Jafilan, Wallace, Sharma, and Millheiser, which were discussed at length by the ALJ in his decision.  See TR. at 24-30.  As summarized above, Drs. Jafilan, Wallace, Sharma, and Millheiser found that Claimant had at least 4/5 strength in the lower extremities and his coordination was intact.  TR. at 25-26, 288-89, 308.  Although each doctor noted some abnormalities, they each found no atrophy or appreciable weakness in Claimant.  Id.  Taken collectively, these opinions provide substantial evidence supporting the ALJ's findings that the opinions of Drs. Nery, Gjolaj, and Huang were not persuasive, and that Claimant failed to show otherwise.  See 20 C.F.R. § 404.1520c(c)(2) ("The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be.").  Moreover, Claimant's argument that ALJ Celaya improperly relied on Dr. Millheiser's opinion simply because it is inconsistent with the opinions of Drs. Nery and Gjolaj is not persuasive given that the ALJ's decision shows he thoroughly considered all of the record evidence in reaching his decision.  See Sims v. Comm'r of Soc. Sec., 706 F. App'x 595, 604 (11th Cir. 2017) ("Under a substantial evidence standard of review, [the claimant] must do more than point to evidence in the record that supports her position; she must show the absence of substantial evidence supporting the ALJ's conclusion.").

Accordingly, ALJ Celaya's finding that the opinions of Drs. Nery, Huang, and Gjolaj are not persuasive is supported by substantial evidence.

**II.      Whether the ALJ failed to properly consider the Claimant's testimony regarding the intensity, persistence, and limiting effects of his symptoms.**

Claimant argues that the ALJ failed to apply the correct legal standards to his testimony regarding his pain and limitations.  See Claimant's Motion for Summary Judgment [D.E. 18-1 at 14].  When a claimant attempts to prove disability based on his subjective complaints, he must provide evidence of an underlying medical condition and either objective medical evidence confirming the severity of his alleged symptoms or evidence establishing that his medical condition could be reasonably expected to give rise to his alleged symptoms. See 20 C.F.R. § 404.1529(a), (b); Wilson v. Barnhart, 284 F.3d 1219, 1225-26 (11th Cir. 2002).  "An individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability . . . ." 42 U.S.C. § 423(d)(5)(A); see also 20 C.F.R. § 404.1529(a).  If the objective medical evidence does not confirm the severity of the claimant's alleged symptoms but the claimant establishes that he has an impairment that could reasonably be expected to produce his alleged symptoms, the ALJ must evaluate the intensity and persistence of the claimant's alleged symptoms and their effect on the claimant's ability to work.  See 20 C.F.R. § 404.1529(c), (d); Wilson, 284 F.3d at 1225-26. An ALJ "must clearly 'articulate explicit and adequate reasons'" for discounting a claimant's allegations of disabling symptoms and limitations.  Dyer v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005) (quoting Foote v. Chater, 67 F.3d 1553, 1561 (11th Cir. 1995)).  Courts "will not disturb a clearly articulated finding supported by substantial evidence."  Mitchell v. Comm'r, Soc. Sec. Admin., 771 F.3d 780, 782 (11th Cir. 2014).

Here, ALJ Celaya found that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in the decision."  TR. at 28. ALJ Celaya then conducted an evaluation of the medical opinions of record.  See id. at 29.  The

relevant medical records discussed by the ALJ provide substantial evidence to support the ALJ's evaluation of Claimant's reported symptoms and limitations.  See id. at 24–30.  As detailed above, the ALJ evaluated the medical opinions of at least seven different providers and compared them with Claimant's subjective complaints of disabling symptoms; in doing so, the ALJ determined that Claimant's statements regarding the severity and persistence of his symptoms were not entirely consistent with the medical evidence or with Claimant's testimony at the hearing.  Id.  For example, the ALJ noted that Claimant reported to Dr. Millheiser that he could no longer enjoy recreational and family activities from pain, yet he stated that he was able to vacation in Belize and to the Florida Keys after his alleged onset date of August 19, 2019.  TR. at 26.  The ALJ also considered Claimant's conservative treatment during the relevant period after his alleged onset date and the lack of a recommendation for surgical intervention by his doctors.  Id. at 24–29.  The ALJ also cited to Dr. Millheiser's findings that Claimant was exaggerating his symptoms in evaluating Claimant's subjective complaints.  Id. at 26, 289-90. Thus, the ALJ articulated explicit and adequate reasons that were supported by substantial evidence for his finding that Claimant's subjective complaints of disabling symptoms were inconsistent with the medical evidence.

## **RECOMMENDATION**

Based on the foregoing considerations, the undersigned RESPECTFULLY RECOMMENDS that Claimant's Motion for Summary Judgment [D.E. 18] be DENIED, the Commissioner's Motion for Summary Judgment [D.E. 19] be GRANTED, and the Commissioner's decision be AFFIRMED.

Pursuant to Local Magistrate Judge Rule 4(b), the parties have **fourteen days** from the date of this Report and Recommendation to file written objections, if any, with the Honorable Beth Bloom, United States District Judge.  Failure to file timely objections may bar the parties from

attacking the factual findings contained herein on appeal.  See Resolution Tr. Corp. v. Hallmark
Builders, Inc., 996 F.2d 1144, 1149 (11th Cir. 1993).  Further, "failure to object in accordance
with the provisions of [28 U.S.C.] § 636(b)(1) waives the right to challenge on appeal the district
court's order based on unobjected-to factual and legal conclusions."  See 11th Cir. R. 3-1 (I.O.P.
- 3).

RESPECTFULLY SUBMITTED in Chambers at Miami, Florida, this 6th day of January,
2023.

ALICIA M. OTAZO-REYES
UNITED STATES MAGISTRATE JUDGE

cc:     United States District Beth Bloom
        Counsel of Record